PUBLIC SERVICE RAILWAY COMPANY

*v.*

THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUDSON.

[Decided November 10th, 1910.]

1. The action of the parties interested is resorted to in aid of the construction of an act only in cases where the construction is doubtful, and the primary question in reference to rights and obligations under statutes relates to the meaning and effect of the statute itself, construed by the rules settled as applying to it.

2. The ultimate control of public rights on the highways of the state is in the state legislature.

3. Traction act of March 14th, 1893 (*P. L. 1893 p. 302 § 1*), empowering street railway corporations to construct their lines over highways, &c., authorizes the construction of such lines over bridges, public bridges and their approaches being "highways," and the rebuilding as necessary any part of the roads over such highways and bridges, and hence the act necessarily limited the sole control over bridges previously existing in the board of chosen freeholders under *1 Gen. Stat. p. 305 § 1* and *p. 410 § 4.*

4. The duty of constructing and maintaining roadbeds and tracks was imposed on a traction company accepting a franchise under the act, without express words in the statute imposing the duty, and it having power to construct its road over bridges was bound to contribute to the expense of rebuilding a public bridge necessitated by the operation of heavier cars propelled by electricity.

Heard on bill, answer and cross-bill, replication and proofs.

The substantial question argued and submitted in this case is the liability of the complainant, a traction company, to contribute toward the expense of the erection of a new bridge con-

structed by the freeholders of Hudson county over the Morris canal, and it arises upon the following facts appearing by the pleadings and undisputed proofs.

The Jersey City and Bergen Railroad Company, a street railroad company incorporated by special act of the legislature in 1859, constructed, and, before 1886, operated by horses, a street railroad in Jersey City and Bayonne on a street called Avenue A, connecting the two cities. This street crossed the Morris canal, which is on the boundary line of the cities, and the street was continued across by a bridge. The south abutment of the bridge is in the city of Bayonne and the rest of the bridge and the canal proper in Jersey City. The bridge was constructed by the board of freeholders of Hudson county and was under its control. On September 29th, 1886, and apparently while the bridge was being constructed, the company applied for permission "to lay a double-track horse railroad over the bridge being constructed across the Morris canal" at Avenue C, connecting their tracks in Jersey City with the tracks now laid by them through Avenue C to Bergen Point. The board on this application granted the company "permission to lay its tracks on the Avenue C bridge over the Morris canal, providing said company keep the flooring of that part of the bridge used by its tracks in good repair." The tracks were laid on the bridge and the railroad operated over the bridge under this permission up to 1893. On September 26th, 1893, and while the company was still operating its street railroad by horses, the company leased its property and franchises to the Consolidated Traction Company, a company incorporated under the Traction act of March 14th, 1893 (*P. L. 1893 ch. 172 p. 302, &c.*), and which shortly after took possession of the leased railroad and operated it. Subsequently the railroad was leased by the Consolidated Traction Company to the North Jersey Street Railroad Company, which then took possession of the railroad and operated it until its consolidation in August, 1907, with two other street railway companies, forming the Public Service Railway Company, the complainant company, which then took possession of the railroad and has since operated it. The leases and consolidation were made under powers conferred by the Traction act of 1893, and although the answer of de-

fendant raises an objection that the act under which the original charter of the Jersey City and Bergen company was, or was claimed to be, extended, was unconstitutional and void, this point was not pressed or relied on at the hearing, and, in view of defendant's cross-bill praying decree for contribution, the point may be considered as abandoned. It was not disputed at the hearing that the complainant had succeeded to rights of the original street railroad company in reference to the operation of the road over the bridge.

When the permission was given by the freeholders in 1886 to the street railroad company to lay its double-track horse railroad on the bridge then being constructed, subject only to keeping the flooring of the part used by the tracks in good repair, the road was operated by horses, and this method was continued until 1893. These horse cars weighed about five tons when loaded, a weight less than that of many loaded vehicles using the bridge in ordinary travel. In 1893 the motive power was changed to electricity, operating by overhead trolley, under the authority of the Traction act of 1893, and the first cars used under the trolley system weighed from seven to ten tons loaded. From that time there has been a steady and continual increase in the weight of the cars used, until at the time of the commencement of the present dispute the cars loaded weighed about twenty-eight tons. The original bridge over the canal, erected in 1886 by the freeholders, was continued in use, but in 1907 the freeholders, deeming the bridge unsafe and insufficient to sustain the traffic by the street cars and vehicles, closed the bridge, except to pedestrians, and took up the matter of constructing a new bridge. Subsequently, and on the application of complainant, the bridge was strengthened by temporary supports sufficient to remove danger in its use by cars and vehicles. The supports rest on lands of the canal company, which in 1908 notified the board that the location of the supports upon its lands was unauthorized and a trespass, and directed their removal. Without these supports on the lands of the company the bridge was not safe for use by vehicles and street cars. Pending the use of these supports, contracts for a new bridge were perfected by the board, and the bridge contracted for is designed with special reference

to sustaining the increased strain occasioned by its use for street railroad travel under the present conditions. By reason of this special provision for the railroad travel the whole expense of the structure, about $14,000, is from $4,000 to $5,000 more than would otherwise have been required. In preparing the contracts the engineers of the county, for the purpose of ascertaining the strength of the bridge required for the street railroad purposes, conferred with engineers employed by the complainant as to the weight of cars to be provided for, and provisions necessary to meet these requirements were inserted in the contracts. Negotiations took place between the company and the board for the purpose of reaching an agreement as to a contribution by the company toward the expenses of the new bridge, but apparently no agreement could be made and the negotiations ceased. The contracts being perfected, the freeholders, on May 21st, 1908, passed a resolution rescinding the permission given to the Jersey City and Bergen company in 1886, and notified the complainant that it denied its right to use the bridge, except upon terms satisfactory to the board, which claimed the ownership and control of the bridge. These terms were declared to be the payment of an annual rental amounting to one-third of sinking fund, maintenance and interest charges of the new bridge about to be constructed. The complainant was further notified that unless it acceded to these terms by a formal agreement by a future date fixed by the notice, its tracks and rails would be removed from the bridge. But it was also informed that timely notice was given in order that complainant might apply for an injunction or other relief, legal or equitable, to which it might consider itself entitled, in order that the controversy between the company and the board as to the former's right to use the new bridge without contributing toward its construction or maintenance might be determined. The complainant thereupon filed its bill to enjoin the removal of its tracks or interference with the operation of its cars, and to require the board to repair and maintain the existing bridge, or to construct a new bridge in lieu thereof, so that the same might be sufficient to accommodate all of the lawful and customary traffic on the avenue and across the bridge, including complainant's cars, and to enjoin the board from con-

structing or awarding a contract to construct any new bridge insufficient for such use. On filing the bill a temporary restraining order was issued, preventing the removal of the tracks from the existing bridge or interfering with the operation of the cars thereon, but, at the hearing upon the rule, it appeared that after filing of the bill the board had awarded a contract for the new bridge to replace the old one, and that the complainant itself had entered into an agreement with the contractor providing for the removal of the tracks in such a manner as not unnecessarily to interfere with the operation of the road. An injunction was then directed to be issued, preventing the removal of the tracks or interference with the operation of the railroad, with the proviso that the injunction should not prevent the removal of the bridge and the construction of a new bridge under the Murphy contract, which, however, must be constructed in the manner agreed on between Murphy and complainant. By this order for the injunction complainant was directed to give bond to comply with any order or decree that might be made in the cause touching the amount to be paid by complainant to defendant for the use of the bridge pending the hearing.

Complainant's bill, while insisting that the defendant is bound in the construction of the new bridge to build one sufficient to accommodate its present and future use of the bridge, makes no offer of contribution toward its construction or maintenance, and, at the hearing, legal or equitable liability to contribute to any extent was expressly denied.

The defendant, on the other hand, both in its answer and at the hearing, while asserting that the construction of the bridge is under the sole control of the board, claims that its whole duty as to construction of a proper bridge would be performed by the erection of a bridge sufficient to accommodate the general public using it in the ordinary way and carrying ordinary loads, and that if the bridge, for the sole purpose of accommodating the traffic over it by complainant's cars, must be built strong and at an increased expense, the complainant is, in equity at least, required to contribute toward the increased expense incurred for its sole benefit. This liability of the company is asserted to have been established by a custom of street railroad

companies under which they have, under like circumstances, made contributions to the cost of construction and rental for use of bridges on highways, and many contracts have been produced in evidence agreeing to make such contribution, some of them made by the complainant or companies subsidiary to it or under its control. On the supposition that complainant has the right, unlimited in any way by defendant's control, to operate its railroad over the bridge, a liability to contribute toward the increased expense is also asserted as being based on the doctrine of conflicting easements of complainant and defendant in the use and control of the bridge and highway, and by a cross-bill, filed in support of its answer, the defendant asks the court to fix the proportion of costs complainant should pay and the annual rental.

The replication denies the existence of any custom or obligation for such contribution, and reasserts its claim that it is the sole duty of defendant to construct and maintain its bridges in such manner as to accommodate all lawful traffic thereon, and to strengthen and rebuild when necessary all bridges that may become insufficient for that purpose at any time.

*Mr. Frank Bergen,* for the complainant.

*Mr. John Griffin,* for the defendant.

EMERY, V. C. (after statement of facts and issues),

The claim of complainant that it is the duty of the freeholders to strengthen and rebuild, at the sole expense of the county, all county bridges that become insufficient at any time to accommodate all lawful traffic over the bridge, must be based on the assumption that the freeholders have the sole power and control over the construction and rebuilding of the bridge in question for the purpose of accommodating all lawful traffic whatever, including that of the complainant. And I think it will be found that everyone of the decisions relied on by complainant's counsel as affirming a duty to accommodate all lawful traffic, have been cases where the party raising the question of liability was not under any obligation whatever in reference to the construction

of the bridge and had no power or rights in reference thereto. The liability and duty of the bridge authorities in such cases is measured by their general duty and obligations toward all persons entitled to the use of the highway, and does not take into account at all the question whether any lawful use of the bridge over the highway, specially conferred by the legislature on the party using it, imposed upon it either expressly or by implication any duty or obligation, either separately or in connection with the bridge authorities, in reference to the construction of the bridge.

None of these cases involve the question which, as it seems to me, is vital in this case, which is whether the Traction act of 1893, under which the complainant claims the franchise for the operation of its road by a change of motive power without the consent of the freeholders, has either expressly or by implication imposed on it some duty or obligation, either separately or in connection with the freeholders, in reference to constructing and maintaining its roadway on and over the bridge in connection with the other lawful public travel?

The contracts made between street railway companies and the bridge authorities which have been put in evidence do not establish any legal or equitable obligation of complainant in this case, either by way of custom or otherwise, and the only legal efficacy any of them can have in the case is that those contracts made by complainant or its subsidiary companies in reference to bridges crossed by their railways, under the authority of the Traction act of 1893 alone, may possibly have some bearing as showing complainant's construction of this statute as imposing some obligation in reference to its use of the bridge under that act. Chief-Justice Hornblower (*In re Trenton Water Power Co.* (*1846*), *20 N. J. Law* (*Spenc.*) *659*), gave some weight to action of a company claiming privileges across a highway in a case involving its implied obligation under a statute. But the action of the parties interested is resorted to in aid of the construction of an act only in cases where the construction is doubtful, and the primary question in reference to rights and obligations under statutes relates to the meaning and effect of the

statute itself, construed by the rules settled as applying to it. The effect of the statute, therefore, must be first determined.

By the first section of the Traction act the legislature (among other things) authorized companies organized under it to acquire and operate any street railways then existing on any of the highways of the state, and as to such existing railways the only legislative condition expressly imposed was that the consent of the company or persons operating the railway should be required. The ultimate control of the public rights on the highways of the state being in the legislature of the state, it has been decided that, so far as the public rights in municipal or local highways were affected, this grant under this Traction act of 1893 of the right to use and operate existing railways had the effect of conferring a legal authority for the operation of such roads, whether or not the railways then existing were operated in the highways by lawful authority under previous existing laws or local ordinances. *Jersey City* v. *North Jersey Street Railway Co.,* 73 *N. J. Law* (44 Vr.) 175; *affirmed on writ of error, Ibid.* (1907), 74 *N. J. Law* (45 Vr.) 774. By the same section power was given to the traction company entering upon and operating any existing street railway to change its motive power from horses to other means of traction, especially electricity, and this change was said by Mr. Justice Swayze, in the opinion in the court of errors and appeals, to have been the well-known and apparent object of the act. 74 *N. J. Law* (45 Vr.) 779. Under previous acts this authority to change the motive power had been generally, if not always, subject to the consent of the municipal or other authorities controlling the highways, and, in giving such consents, reasonable conditions as to the maintenance and repair of the street upon which the railway was laid might be lawfully imposed, which, if accepted, were held to constitute binding contracts.

With the vastly increased use of street railways for public travel, this change of motive power has necessarily led to complete and radical changes in the physical construction of the road —its roadbed, rails and supports in the streets and highways and over bridges, as well as in the weight of its cars. As to the future extension of existing street railways and the future con-

struction of new lines to be operated with electricity or other power, provision was made (section 1) for the protection of the public against increased burden of maintaining the streets by requiring the consent of the municipal body having control of highways, but as to the existing railways through the state—a very extensive system of roads—the change of motive power and subsequent operation was not in express terms made subject to any conditions which would expressly relieve or protect any public or local authorities having control of the highways, or the bridges which made part of them, from the increased burden in their construction, maintenance and repair, which resulted solely from the necessity of providing for the increasing requirements of the new system of traction. By the subsequent act of April 21st, 1896 (*P. L. 1896 pp. 329, 322*), the consent of the freeholders was required to any change of motive power afterwards made in street railways over county bridges, but as the change now in question was made in 1893, this later act does not apply to the case, and the rights and duties of the complainant depend upon the effect of the act of 1893. Previous to the Traction act of 1893 the sole control of bridges upon highways was in the board of chosen freeholders of the county, and it was the duty of this board to maintain and keep the county bridges in repair. *"Bridges," Gen. Stat. 305 ¶ 1, &c.;* *"Chosen Freeholders," Ibid. 410 ¶ 4; Whitall* v. *Freeholders (Supreme Court, 1878), 40 N. J. Law (11 Vr.) 302.* The board also had the right in proper cases to refuse to permit a street railway company to occupy a bridge with its tracks. *Elmer* v. *Freeholders (Supreme Court, 1894), 57 N. J. Law (28 Vr.) 366.* The company in this case was not organized under the act of 1893.

The first question in the case is whether, as between the board and the traction company, the Traction act has not expressly granted to companies organized under it the franchise to construct, maintain and operate by electric power existing railways over bridges in the highways, and to that extent limited the previous sole control of the board over county bridges. If so, then the question arises, What are the respective rights and obligations of the board of freeholders and of the traction company as between themselves in reference to the construction, maintenance

and operation of the bridges over which these existing roads operate and the bridges which necessarily replace them?

Whether the freeholders, as between themselves and the public not using the bridges under special franchises, are responsible for the repair and maintenance of the bridges, including their use for the railways, may be a different question. In the absence of express provision by statute, the freeholders, as between themselves and the public, may not be absolved from the duty of building a bridge sufficient to accommodate all lawful travel, including that arising from the increased burden of complainant's travel.

It has been held that where a turnpike company was authorized to repair and rebuild a county bridge and to take tolls, this might have the effect of making the turnpike company primarily liable for payment of the expense of repairs, as between it and the county, but did not relieve the county from liability to indictment for failure to keep the bridge in repair, in the absence of express provisions relieving it from the common law duty, or imposing this duty on some other person. *Rex* v. *Oxfordshire (1825), 4 Barn. & C. *194.*

The power conferred upon the traction companies as to existing railways by the section in question, both as to highways and bridges, was obviously intended to be as broad and extensive as words could make it, but the language is involved, and the whole of the section containing the grant of power should be recited:

"1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:* That it shall and may be lawful for three or more persons, one of whom shall be a resident of the State of New Jersey, to associate themselves into a corporation for the construction and operation of motors, cables and other machinery for supplying motive power to street railways or other railroads operated as street railways, and the necessary apparatus for applying the same, and such corporation when formed in accordance with the provisions of this act, shall have power to enter upon any street, road, lane, alley or other highway, upon which any street railway or other railroad operated as a street railway is now or may hereafter be constructed (with the consent of the owner or owners, lessee or lessees of such railway or of the person or persons operating the same), and make, construct, apply, maintain and operate such railway, motors, cables, electrical or other devices and appliances, with power to erect, construct, apply, maintain, and use such tunnels, subways, for cables, poles, wires, conduits, or other devices for transmitting and using electrical or other forces, as will provide for the traction of cars on street railways or other railroads operated as street

railways, and to construct lines of street or passenger railway, and all necessary turnouts, sidings, and bridges on, along, through, or over any street, road, lane, alley, stream or highway; either by extension of existing railways, or by the building of new lines thereon, either wholly within or partly within or wholly between or partly within and between, cities, towns, boroughs, villages, townships and counties, and the same when constructed, to equip, maintain, use and operate for the carriage of persons and property for compensation to be made such corporation, and to contract with any other person or persons, natural or artificial, for such construction, equipment, maintenance, use or operation * * *."

Public bridges and their approaches are highways (*Mahnken* v. *Freeholders* (*Court of Errors and Appeals, 1898*), *62 N. J. Law* (*33 Vr.*) *404, 408; Spencer* v. *Freeholders* (*Court of Errors and Appeals, 1901*), *66 N. J. Law* (*37 Vr.*) *301, 304*), and this section gives, in my judgment, power to construct and maintain the railway and to operate it with electric power over any part of the highways (including bridges as part of them) on which any street railway then existed, and in this operation from time to time to rebuild as may be necessary any part of the road over these highways and bridges. And the franchise to equip, maintain and operate the road for the carriage of persons and property "for compensation to be made to the corporation" having been given, the duty of constructing and maintaining the roadbed and tracks taken possession of by the traction company, under the act, was imposed on the company by the acceptance of the franchise and without the necessity of any express words in the statute imposing the duty. *Fielders* v. *North Jersey Railroad Co.* (*Court of Errors and Appeals, 1902*), *68 N. J. Law* (*39 Vr.*) *343, 344*, was a case involving the duties of a street railway company to a traveler on the highway, and Mr. Justice Pitney says: "It is familiar law that a railway company having the right to lay tracks in a public street is bound by the general principles of the common law and without either a specific statute or ordinance or a contractual obligation to lay its tracks in a proper manner and to keep them in a proper state of repair." Citing *2 Thomp. Negl.* (*2d ed.*) § *1353*. This obligation would clearly extend to the construction of the roadbed on which the sleepers, ties and tracks were supported, and I think there can be no question that under the Traction act of 1893, the companies have the right from time to time to make and change the construction of their roadbed and

tracks to meet the increasing necessities and burdens of the traffic and to discharge these duties of safely constructing, maintaining and operating their roads, imposed on them by the acceptance of the franchise under the statute. Under the ordinary conditions of construction on streets and highways where there are no bridges, culverts or other breaks or crossings of the street, the construction and maintenance of the roadbeds and tracks of the street railway proceed without any necessity for changing the road not occupied by the tracks, and are therefore under the sole discretion and control of the company, saving only police regulations incident to the prevention of unnecessary interference with the use of the street for travel during construction. If the authority to so construct its roadbed and tracks over bridges for the use of electric power, as well as over any other part of the street or highway, is given by this act, then I think that having made the change in the exercise of the authority, the duty to construct, maintain and operate its railway, with its supports, roadbed and tracks over bridges, goes with the power, as certainly as it goes with the power to construct and operate the railway in the other parts of the highway. And if this be the proper construction of the powers and duties of traction companies under the act, then as to the existing street railway lines the Traction act has, to the extent of these powers given to the companies to change the motive power and operate the road with it, necessarily limited the previously existing control over county bridges which existed in the freeholders, and has made such control either for repair or rebuilding one which must be exercised in connection with the rights and duties of the traction companies under the act. In other words, the control of the freeholders over such county bridges where the railway lines already existed is, by this act, necessarily limited by the franchise of the traction company to construct, maintain and operate its railway over such bridge with electric or other power; and the franchise being given with the right to take compensation for the use of its railway over the highways (including its bridges), the duty of the freeholders to maintain the bridge in repair for the public does not, as between them and the company, include the performance of the duty imposed on the company of itself constructing and keeping in repair

its railway, with its roadbed and tracks, for the operation of the road by electric power, over the bridges of the county crossed by them. In rebuilding the bridge with the stronger supports and structure made necessary solely for carrying complainant's roadway to operate its heavier cars, the freeholders are *pro tanto* constructing the complainant's own roadway—a duty imposed on them on accepting the franchise under the statute. If the rights of the complainant on the bridges in highways had been limited by the act to the rights of the street railway company whose road was taken over, it would have extended in this case only to the use for "a double-track horse railroad," as originally given, and the terms or conditions upon which this consent was given, would have constituted, as between complainant and the freeholders, a final agreement as to the complainant's liability. But the legislative grant, subsequent to the contract, of the right to change the motive power to electricity, and construct, maintain and operate the road over the bridge by this changed power, conferred upon the complainant an additional franchise or easement on the bridge not covered by the original consent, and which necessarily conflicts with the control which the freeholders were entitled to exercise under the laws and the agreement. The power of the freeholders in cases controlled solely by the act of 1893 is no longer exclusive, and as the traction company by this act has only a franchise or easement on the bridge for a special purpose, it follows that where the board and the traction company cannot agree in the exercise of their rights as to the repair or construction of such bridge, this court, under its admitted jurisdiction over conflicting easements or rights in highways, may settle the controversy.

The precise phase which a controversy as to the control of the board and the franchise of the company to operate a road with electricity or other power may take, depends upon the circumstances of each case. In the present case there is no substantial dispute as to the necessity and propriety of erecting a new bridge for the use of the general public without regard to the increased burden imposed by complainant's use since the change of motive power, nor is there any question that the greatly increased weight and the impact of the traction company's heavier cars, following

the change to electric power, necessitate building a stronger and more durable bridge than would otherwise be necessary, and that this increased expense, due to the necessity of providing for the increase in weight and capacity of the cars, since the change of motive power, can be approximately determined.

The situation is plainly such that the course taken by the parties was the proper one, viz., the construction of a single bridge for the accommodation of all the public travel, including complainant's, rather than separate bridges or sections of a bridge for the complainant's and other travel, and the construction of the bridge under the control and authority of the board, subject to provisions for protecting complainant's travel pending construction. The only controversy to be settled therefore in this case is the right of the board to contribution and the amount.

I conclude for the reasons above given that the board of freeholders have the right to claim contribution from the complainant toward the expense, and at the time of settling decree will hear counsel further, if they desire, as to the amount.